**UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| In re DANIEL H. CLARK, | : | Chapter 7 |
| | : | |
| Debtor | : | Bky. No. 17-10067 ELF |
| | : | |
| | : | |
| ANDREW R. VARA, | : | |
| ACTING UNITED STATES TRUSTEE, | : | |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | |
| | : | |
| DANIEL H. CLARK, | : | |
| | : | |
| Defendant | : | Adv. No. 17-194 |
| | : | |

# O P I N I O N

## I. INTRODUCTION

On January 5, 2017, Daniel Clark ("the Debtor") filed this voluntary chapter 7

bankruptcy case.  On July 7, 2017, the U.S. Trustee ("the UST") filed an adversary complaint

objecting to the Debtor's discharge.[1]

In the complaint, the UST objects to the Debtor's discharge under 11 U.S.C. §§

727(a)(2)(A) and (a)(4)(A).  The UST alleges that the Debtor concealed transfers of property

during the year preceding the filing of this bankruptcy case and that he did so with the intent to

hinder, delay and/or defraud his creditors and/or the chapter 7 trustee. The UST also alleges that

---

[1]    April 11, 2017 was the original deadline for filing an objection to the Debtor's discharge
under 11 U.S.C. § 727.  Following a motion by the UST, that deadline was extended to July 10, 2017.
The Debtor did not oppose the UST's motion.

the Debtor knowingly and fraudulently made false oaths in his bankruptcy schedules and

Statement of Financial Affairs.

The Debtor answered the complaint on August 9, 2017.  Trial of this adversary

proceeding was held and concluded on March 15, 2018. Thereafter, the parties submitted

proposed findings of fact and conclusions of law in support of their positions, the last of which

was filed on May 11, 2018.

For the reasons set forth below, I find that the UST has proven his case under §727(a)(4).

Therefore, the Debtor's discharge will be denied.

## II.  FINDINGS OF FACT

Based on the credibility and demeanor of the trial witnesses, the plausibility of their

testimony, the existence of corroborating circumstantial, testimonial or documentary evidence,

the totality of the evidentiary record presented at the trial, and my consideration of the parties'

post-trial submissions, I make the following findings of fact:

### A.  The Debtor

1.  The Debtor is 59 years old.  (Audio 2:13:20).[2]

2.  Since 1984, the Debtor has been receiving veteran disability benefits of approximately

    $1,079.00 on a monthly basis.  (Ex. T-21; Audio 41:30).

3.  In 1985, the Debtor went back to school through a disabled veterans program and earned a

---

[2]        All references in this Opinion to "Audio" refer to the time stamp from the audio file of
the March 15, 2018 trial that was docketed as an attachment to a PDF file. See Adv. No. 17-194, Doc. #
14.

bachelor's degree in civil engineering from the University of California at Davis. (Audio 2:13:20).

4.  Between 1990 and 1997, the Debtor worked for the federal highway administration, which paid for him to attend Villanova University where he earned a masters degree in civil engineering.  He also did some postgraduate work at Drexel University. (Audio 2:14:25).

5.  Following his work for the highway administration, the Debtor worked as a transportation engineering consultant in Pennsylvania.  In early 2003, he stopped working for a brief period because of a medical condition that required surgery.  (Audio 2:14:25).

6.  In 2004, the Debtor became the president and majority shareholder of M.D. Clark, Inc., d/b/a First Service Restoration ("M.D. Clark"), a fire and water restoration and remediation company that operated as a franchise of PuroSystems, Inc. (Audio 34:50-35:24).

7.  M.D. Clark ceased operations in 2016.  (Ex. T-20; Audio 2:11:40).

8.  Presently, the Debtor works as a civil engineer doing project management for a veteran's hospital. (Audio 2:16:57).

9.  He generally works from 2:30 p.m. to 11:00 p.m., overseeing contractors as a technical representative or contracting officer, but not overseeing any staff.  Id.

10. The Debtor suffers from chronic pain and sees Dr. Jay Mergaman, M.D. for pain management.  Dr. Mergaman prescribes Tylenol 60/300 to the Debtor, which he can use once every six (6) hours.  (See Ex. D-7).

11. The Debtor feels his memory is deteriorating and that this decline affects his work because he must write things down to remember; however, the Debtor has not been subjected to any disciplinary action related to memory problems or cognitive dysfunction.  (Audio 2:18:38).

-3-

## B.  Mrs. Clark

12.  The Debtor has been married to Vavara Clark ("Mrs. Clark") for twenty-six (26) years.

(Audio 2:00).

13.  Mrs. Clark is a trained dentist and has operated her own private dental practice for

approximately seventeen (17) years.  (Audio 18:30).

## C.  The Insider Loans to M.D. Clark

14.  The Debtor owned and operated M.D. Clark for approximately twelve (12) years prior to

filing this bankruptcy case. (Audio 35:27).

15.  Mrs. Clark was neither an owner, officer or director of M.D. Clark.  (Audio 15:00).

16.  In October and November 2015, the Clarks jointly lent $137,000.00 to M.D. Clark.[3]

---

[3]     The existence of insider loans to M.D. Clark is a significant factual issue in this case. The paper trail and details of any such loans are both sparse and inconsistent.

The balance sheet included as part of M.D. Clark's 2014 federal income tax return stated that at the beginning and the end of 2014, loans from shareholders totaled $21,856.00 (Ex. T-18 at 7). M.D. Clark's 2015 tax return stated that there was a shareholder loan of $21,856.00 at the beginning of 2015 and no shareholder loans at the end of the year. (Ex. T-19, at 7).  M.D. Clark's 2016 tax return stated that there were no outstanding shareholder loans made that year.  The balance sheet that M.D. Clark filed on February 5, 2016, the day it commenced its chapter 11 case, continued to show an existing shareholder loan of $21,856.47.  (Ex. T-13).

The Debtor could not explain the discrepancies between the 2016 tax return and the balance sheet filed in the M.D. Clark bankruptcy case. (Audio 2:07:00).

Further, in M.D. Clark's bankruptcy (discussed in more detail in the text below), the Clarks were neither listed as unsecured creditors on the schedules nor on the list of creditors to receive payments from the escrowed funds as part of the structured dismissal of the case.  (See Bky. No. 16-10800, Doc. # 40; Ex. T-15).

However, the Debtor also introduced Ex. D-9 into evidence.  Ex. D-9 is an M.D. Clark quickbooks balance statement, apparently prepared on August 31, 2017, that shows a series of shareholder loans to the company.  Among those loans are six (6) cash transfers between October 6, 2015 and November 4, 2015, totaling $137,000.00.  Interestingly, the internal notations describe the

(continued...)

17. There are no written loan documents evidencing the loan transaction or transactions

between Mr. and Mrs. Clark (collectively, "the Clarks") and M.D. Clark.  (Audio 1:21:00).

18. The source of the loan funds was a home equity loan provided by Malvern Federal Savings

Bank.  (Audio 2:03:10 - 2:05:00).

19. On his bankruptcy Schedule D, the Debtor listed Malvern Federal Saving Bank as a secured

creditor with a claim of approximately $132,000.00.  (Ex. T-3).


### D.  The M.D. Clark Bankruptcy Case

20. On February 5, 2016 (eleven (11) months before the Debtor's personal bankruptcy filing),

M.D. Clark filed a voluntary petition under chapter 11 of the Bankruptcy Code in this court.

21. The Debtor signed the petition as President of M.D. Clark under chapter 11.  (See Bky 16-

---

[3](...continued)
transactions as either "Funds Transfer - Daniel," "Daniel Personal," or "Daniel Personal LOC."  There is
no mention of Mrs. Clark.

Despite all of the discrepancies, I do credit the general outline of the narrative provided
by the Debtor.  Notwithstanding the inconsistent documentation, I find it plausible that, as M.D. Clark
suffered business reversals, the Debtor convinced his spouse to permit him to draw down their Malvern
home equity loan in order to infuse $137,000.00 in cash into his struggling business. And I consider it fair
and accurate to characterize the loan as coming jointly from the Clarks, notwithstanding the inconsistent
quickbooks description in Ex. D-9.

That said, I reject the Debtor's attempt at trial to characterize the loans even more
favorably, as involving two (2) separate loans in equal amounts, one (1) from Mrs. Clark and one (1) from
the Debtor, totaling $120,000.00 (or perhaps more accurately, $137,000.00), (Audio 1:21:00, 1:48:00).
The Debtor's testimony is implausible.  I perceive it as a weak attempt to justify later transactions in
which M.D. Clark made payments directly to Mrs. Clark, rather than to the Debtor or to the Clarks
jointly.

In the end, my factual finding is simple.  In October and November 2015, the Clarks
jointly lent $137,000.00 to M.D. Clark.

10800; Ex. T-9).

22. Three (3) days after commencing its chapter 11 case, M.D. Clark filed an expedited motion
to sell assets. (See Bky. 16-10800, Doc. # 12).

23. The court granted the motion approving the asset sale on February 22, 2016, (Id. at Doc. #
49), and the sale closed that day.

24. Specifically excluded from the assets being sold was M.D. Clark's right, title or interest in
"[a]ny cash, and cash equivalents" owned by M.D. Clark on the closing date. (Ex. T-14,
Asset Purchase Agreement at 5).

25. The unadjusted balance in M.D. Clark's bank account on the date of closing was
approximately $138,000.00.  (Ex. T-25 at 415).

26. Two (2) days after the sale closed, a motion to dismiss the bankruptcy case was filed. The
motion provided for payment of a dividend of approximately 3% to the unsecured creditors
of M.D. Clark from the escrowed funds upon dismissal. (Ex. T-14).

27. The motion to dismiss was granted on March 31, 2016. An order was entered requiring
M.D. Clark to make $10,000.00 in distributions to its unsecured creditors as set forth in
Exhibit A to the order. (Ex. T-15).

28. Upon dismissal of the M.D. Clark bankruptcy, the Debtor remained liable as a guarantor of
many of M.D. Clark's unpaid debts.

### E.  The Transfers from M.D. Clark to the Clarks

29. In January 2016, one month prior to the M.D. Clark bankruptcy filing, M.D. Clark
transferred a total of $57,000.00 from its account at TD Bank ("the M.D. Clark TD

Account") to the Clarks' joint banking account ("the Joint TD Account") through the

following two (2) transfers:

    a.  January 4, 2016 – $30,000.00

    b.  January 29, 2016 – $27,978.76

(See Ex. T-25, at 408).

30.  On March 29, 2016, following the February 22, 2016 M.D. Clark asset sale, but prior to the

dismissal of the M.D. Clark bankruptcy case, $10,000.00 was transferred from the M.D.

Clark TD Account to the Joint TD Account. (Id. at 418).

31.  On March 31, 2016, the date the M.D. Clark bankruptcy case was dismissed, $47,000.00

was transferred from the M.D. Clark TD Account to the Joint TD Account.[4]  Id.

32.  On April 22, 2018, (after dismissal of the M.D. Clark bankruptcy), $1,400.00 was

transferred from the M.D. Clark TD Account to the Joint TD Account.  (Id. at 419).[5]

### F.  The Clarks' Banking Habits

33.  For nearly seventeen (17) years, following 1999, the Clarks held  a joint checking account

with Bank of America into which they regularly deposited their respective paychecks and

the Debtor's veteran's disability check. They used that account to pay household expenses.

(Audio 20:00; Ex. T-21).

---

[4]  The Debtor claims that the transfer should have been directly from the MD Clark Bank Account to Mrs. Clark's Individual TD Account as repayment of the loan made by Mrs. Clark.  (Audio 1:48:00; Debtor's Br. at 8).

[5]  I am aware that in describing certain transactions, I am using the passive voice.  I do so because my findings are derived from the documentary evidence.  Nevertheless, the only reasonable inference to be drawn is that the Debtor, as the principal of M.D. Clark, was responsible for effecting these transactions.

34. The Clarks conducted banking with TD Bank through the following three (3) accounts:

    a. the Joint TD Account (Ex. T-22);

    b. Mrs. Clark's own individual account ("Mrs. Clark's Individual TD Account") (Exs. T-7 & T-8); and

    c. an account maintained by M.D. Clark (Ex. T-25).[6]

### G.  Transfers from and between the Clarks' Bank Accounts

35. Between February 22, 2016 and March 29, 2018, the Clarks withdrew a total of approximately $51,000.00 from the Joint TD Account as follows:

    a. February 27, 2016 – $22,000.00

    b. February 27, 2016 – $18,339.68

    c. March 20, 2016 – $1,200.00

    d. March 29, 2016 – $10,000.00

(Ex. T-22 at 486, 481, 489).

36. In April 2016, the Clarks withdrew $9,200.00[7] from the Joint TD Account. (Ex. T-22 at 482, 484 and 487).

37. The Debtor could not explain at trial the reason for, or the disposition of, the more than $50,000.00 in transfers listed in Finding of Fact Nos. 35-36.  (Audio 1:49:00).

---

[6]    The record does not reflect when these accounts were opened.

[7]    This was accomplished through three (3) separate withdrawals as follows:

        April 2 – $3,000.00
        April 4 – $3,000.00
        April 6 – $3,200.00

(Ex. T-22 at 444, 482, 484).

38. On April 4, 2016, the Clarks electronically transferred $40,000.00 from the TD Joint

 Account to Mrs. Clark's Individual TD Account ("the TD Joint Account Transfer").  (Ex. T-

 22 at 444).

39. Sometime in the next month (May 2016), the Debtor and Mrs. Clark ceased using Bank of

 America for their household expenses and, instead, used their joint and individual accounts

 at TD Bank for that purpose.  (Audio 17:00; 21:00).[8]


**H.  Transfers of Two (2) Pocono Properties**

40. On May 13, 2016, the Clarks sold a jointly owned property, 6 Mountain Ash Drive, Lake

 Harmony, PA, and received net proceeds of $35,937.73. (Ex. T-8).

41. They deposited the proceeds from the sale of the Mountain Ash Drive property in Mrs.

 Clark's Individual TD Account on May 18, 2016.  Id.

42. A few months later, on September 30, 2016, the Clarks sold another jointly owned property,

 46 Hickory Drive, Lake Harmony, PA and received net proceeds of $36,598.76. (Ex. T-7).[9]

43. They also deposited the proceeds from the second sale into Ms. Clark's TD Account.  Id.

44. Attached as Appendix I is a summary in table format of the transfers described above in

 Parts II. E, G, and H.

---

[8]     Mrs. Clark testified that she and the Debtor stopped banking with Bank of America because they no longer liked the bank. The Debtor testified, however, that Bank of America was a creditor in the M.D. Clark case (and the Debtor's case) and he was concerned that the bank would seize money from their joint Bank of America account to satisfy its claims.  (Audio 2:27:24).

[9]     Both properties discussed in Findings of Fact Nos. 40-42 are located in the Poconos region of Pennsylvania, so I will refer to them collectively as "the Pocono Properties."

### I.  The Debtor's Personal Bankruptcy; the Omissions in the Debtor's
### Bankruptcy Schedules, SOFA;  and the Debtor's Subsequent Disclosures

45.  When the Debtor filed this individual bankruptcy case on January 5, 2017, he was a

defendant in an action filed by PuroSystems, which was seeking a judgment in the amount

of $250,000.00 against M.D. Clark and the Debtor.

46.  The PuroSystems litigation was in arbitration and the Debtor's bankruptcy petition stayed

an arbitration hearing scheduled for January 9, 2017.

47.   On January 18, 2017, the Debtor filed his bankruptcy schedules ("Schedules") and

statement of financial affairs ("SOFA").  (Ex. D-1).

48.  In the original Schedules and SOFA, the Debtor incorrectly listed his monthly gross income,

rather than his annual income[10] and disclosed an IRA account at Morgan Stanley as his only

financial account.  The Debtor did not disclose his annual veteran's disability benefit or any

other financial accounts.  (Ex. D-1).

49.  In the original SOFA, the Debtor disclosed that he did not transfer any property within two

(2) years of the commencement of his bankruptcy case.

50.  On February 8, 2017, two (2) days prior to the §341 meeting of creditors, the Debtor sent

the following documents to the chapter 7 Trustee:

    (a)  his personal 2015 tax returns;

    (b)  a statement of the balance in the Joint TD Bank Account as of December 11,
         2016;

---

[10]     The initial amounts the Debtor listed in Paragraph 4 of his SOFA were as follows:

$6,933.00 in wages for the period of January 1 to December 31, 2016;

$5,000.00 for operating a business from January 1 to December 31, 2016;

$9,750.00 for operating a business from January 1 to December 31, 2015.

See (Ex. D-1).

(c) a Listing Agreement for the Debtor's residence at 44 Pine Valley Road;

(d) a Wells Fargo mortgagee statement for 44 Pine Valley Road; and

(e) the Debtor's most recent pay stub.

(Ex. D-4).

51. On February 9, 2017, one (1) day prior to the §341 meeting of creditors, the Debtor filed amended Schedules A and B to disclose the Joint TD Bank Account, which had a value of $123.32. (Ex. D-2).  The amended schedules still did not reflect the Debtor's total gross income and all sources of income.  (Ex. D-3).

52. On February 10, 2017, at the §341 meeting, the Debtor testified under oath that the information on his schedules and SOFA was true and correct.  But, when further questioned by the chapter 7 Trustee, the Debtor admitted that he sold at least two (2) jointly owned properties within one (1) year of the petition date. (Audio 1:34:00).

53. At the conclusion of the §341 meeting of creditors, the chapter 7 Trustee requested that the Debtor provide certain documents within ten (10) days.

54. On February 20, 2017, the Debtor provided the following documents to the chapter 7 Trustee:

(a)   proof of value of Residence;

(b)   copy of signature page of voluntary chapter 7 petition;

(c)   chart listing the Debtor's unsecured debt;

(d)   proof of 2nd mortgage balance;

(e)   settlement statements for the sale of both Pocono Properties; and

(f)   an amended SOFA to include a reference to the sale of the Pocono Properties that

-11-

occurred during the eight (8) months prior to filing the bankruptcy petition.

(Ex. D-5).

55. The amended SOFA, filed on February 20, 2017, did not disclose the TD Joint Account

Transfers described in Finding of Fact Nos. 29-32.

56. On March 28, 2017, after the Debtor provided additional documentation to the Trustee,

including copies of joint checking and savings accounts from Bank of America and

statements for several TD accounts, the Trustee concluded the Debtor's §341 meeting of

creditors and filed a report of no distribution.


## III.  LEGAL STANDARDS FOR DENIAL OF DISCHARGE UNDER §727(a)(2)(A) AND §727(a)(4)(A)

Under § 727(a) of the Bankruptcy Code, an individual chapter 7 debtor is entitled to a

discharge unless one of number of specified grounds for denial of a debtor's discharge applies.

Denying a debtor's discharge is an "extreme step and should not be taken lightly."  In re Burke,

523 B.R. 765, 769 (Bankr. E.D. Pa.. 2015) (quoting Rosen v. Bezner, 996 F.2d 1527, 1531 (3d

Cir. 1993)); see also In re Coley, 433 B.R. 476, 487 (Bankr. E.D. Pa. 2010).  Accordingly, the

discharge provision is construed liberally in favor of debtors.  Id.

In this case, the UST objects to the Debtor's discharge under both §727(a)(2)(A) and

§7272(a)(4).


### A.  Count I:  § 727(a)(2)(A)

Section 727(a)(2)(A) of the Bankruptcy Code bars the entry of a discharge if:

> the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the
> estate charged with custody of property under this title, has transferred, removed,

> destroyed, mutilated, or concealed, or has permitted to be transferred, removed,
> destroyed, mutilated, or concealed—
>
>> (A) property of the debtor, within one year before the date of the filing of
>> the petition....

11 U.S.C. § 727(a)(2)(A).

This provision has two (2) core requirements :

> (1) "an act (*i.e.,* a transfer, removal, destruction, mutilation or a concealment of
> property) and
> (2) scienter (*i.e.,* a subjective intent to hinder, delay, or defraud a creditor).

Burke, 523 B.R. at 769.

> Section 727(a)(2)(A) breaks down the "act" requirement into three (3) distinct elements:
> (1) the act was done at a time subsequent to one year before the filing of the
> petition;
> (2) the act was committed by the debtor or the debtor's duly authorized agent; and
> (3) the act consisted of transferring, removing, destroying or concealing the
> debtor's property.

Id.

Establishing the requisite scienter under §727(a)(2)(A) imposes a considerable burden on a plaintiff objecting to a debtor's discharge. The plaintiff must demonstrate by a preponderance of the evidence that the Debtor had an **actual** fraudulent intent; constructive fraud is insufficient. E.g., In re Lybrook, 544 B.R. 537, 548 (Bankr. W.D. Pa. 2015); In re Hadad, 2008 WL 2156354, at *2 (Bankr. E.D. Pa. May 21, 2008).

Because a debtor is unlikely to admit that his or her actions were motivated by fraud, the plaintiff's evidentiary burden is eased somewhat by the court's ability to infer actual intent through circumstantial evidence or a course of conduct. Indeed, courts will consider certain

types of factual circumstances, known as "badges of fraud," in determining whether it is

appropriate to infer the existence of actual fraudulent intent.   Courts have considered as many as

eleven (11) circumstances as "badges of fraud:"

1. The transfer or obligation was to an insider.

2. The debtor retained possession or control of the property transferred after the transfer.

3. The transfer or obligation was disclosed or concealed.

4. Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.

5. The transfer was of substantially all of the debtor's assets.

6. The debtor absconded.

7. The debtor removed or concealed assets.

8. The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.

9. The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.

10. The transfer occurred shortly before or shortly after a substantial debt was incurred.

11. The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

In re Glunk, 342 B.R. 717, 734 n.30 (Bankr. E.D. Pa. 2006) (citing In re Crater, 286 B.R. 758,

764 (Bankr. D. Ariz. 2002)); see also In re von Kiel, 550 F. App'x 105, 109 (3d Cir. 2013)

(nonprecedential) (citing In re Retz, 606 F.3d 1189, 1200 (9th Cir.2010)).

### B.  Count II: §727(a)(4)(A)

Pursuant to §727(a)(4)(A), a debtor may be denied a discharge if "the debtor knowingly and fraudulently, in or in connection with the case . . . made a false oath or account."  11 U.S.C. §727(a)(4)(A).

Section 727(a)(4)(A) is designed to ensure that the debtor provides honest and reliable information to the trustee and others interested in the administration of the bankruptcy estate without their having to conduct costly investigations to discover the debtor's true financial condition.  E.g., In re Singh, 433 B.R. 139, 154 (Bankr. E.D. Pa. 2010) (citing cases); accord In re Von Kiel, 461 B.R. 323, 340 (Bankr. E.D. Pa. 2012), aff'd, 550 F. App'x 105 (3d Cir. 2013).

To challenge successfully a debtor's discharge under §727(a)(4)(A), a plaintiff must demonstrate by a preponderance of the evidence that:

> (1) the debtor made a false statement under oath;

> (2) the debtor knew the statement was false;

> (3) the debtor made the statement with the intent to deceive; and

> (4) the statement was material to the bankruptcy case.

Singh, 433 B.R. at 154.

A false statement is made knowingly if the statement is

> (1) known by the debtor to be false;

> (2) made without belief in its truth; or

> (3) made with reckless disregard for the truth.

E.g., In re Young, 576 B.R. 807, 815 (Bankr. E.D. Pa. 2017).

Generally, to satisfy the requirement that a false statement was made knowingly, the plaintiff must prove that the debtor knew the truth "and nonetheless willfully and intentionally [swore] to what is false."  Singh, 433 B.R. at 154 (quoting Cadle Co. v. Zofko, 380 B.R. 375, 382 (W.D. Pa. 2007)).  However, case law provides that reckless disregard for the accuracy of the oaths made in a bankruptcy case satisfies the scienter requirement under §727(a)(4).  Daniels v. Agin, 736 F.3d 70, 85 (1st Cir. 2013) (citing In re Tully, 818 F.2d 106, 112 (1st Cir. 1987)); In re Yonikus, 974 F.2d 901, 905 (7th Cir. 1992); Scimeca v. Umanoff, 169 B.R. 536, 543 (D.N.J. 1993) (citing cases), aff'd sub nom In re Scimeca, 30 F.3d 1488 (3d Cir. 1994) (Table); accord In re Spitko, 357 B.R. 272, 313-14 (Bankr. E.D. Pa. 2006).[11]

The requisite intent under §727(a)(4) can be proved by circumstantial evidence or inferred from a pattern of nondisclosure and concealment.  E.g., In re Oakley, 503 B.R. 407, 426 (Bankr. E.D. Pa. 2013), aff'd, 530 B.R. 251 (E.D. Pa. 2015).

---

[11]     The reported decisions under §727(a)(4)(A) generally lack a detailed description of the "reckless disregard" standard.  However, case law in other, related areas provides guidance.

Under 11 U.S.C. §523(a)(4), the scienter requirement for "defalcation" may be satisfied by "reckless conduct," which the Supreme Court describes as a conscious disregard or willful blindness to "a substantial and unjustifiable risk."  Bullock v. BankChampaign, N.A., 569 U.S. 267, 274 (2013).

In the securities law context, our Court of Appeals defines recklessness as "[h]ighly unreasonable (conduct), involving not merely simple, or even inexcusable negligence, but an **extreme departure** from the standards of ordinary care ... which presents a danger ... that is either known to the defendant or is so obvious that the actor must have been aware of it."  U.S. S.E.C. v. Infinity Group Co., 212 F.3d 180, 192 (3d Cir. 2000) (emphasis added) (quoting McLean v. Alexander, 599 F.2d 1190, 1197 (3d Cir. 1979)).

I perceive the "conscious disregard" and "willful blindness" to be appropriate standards in applying §727(a)(4)(A) and evaluating a debtor's performance of his or her duty to make full and accurate disclosure in the bankruptcy schedules and SOFA .

An omission is considered material under §727(a)(4) when the subject "bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or existence and disposition of property."  Young, 576 B.R. at 814; accord In re Chalik, 748 F.2d 616, 618 (11th Cir. 1984); see also In re Dawley, 312 B.R. 765, 784 (Bankr. E.D. Pa. 2004).

An honest mistake or oversight is not sufficient to deny a debtor his or her discharge. Spitko, 357 B.R. at 312.  However, proof of actual harm to creditors is unnecessary and the debtor cannot excuse the omission by claiming the property not disclosed was of little or no value to the bankruptcy trustee.  Id.

# IV.  THE PARTIES' ARGUMENTS
## A. §727(a)(2)(A)

In objecting to the Debtor's discharge under §727(a)(2)(A), the UST focuses on

(1) the $58,400.00 that was transferred at the conclusion of the M.D. Clark bankruptcy case to the Joint TD Account, i.e., the Clarks' joint bank account;

(2) the $41,200.00, the Debtor withdrew from the Joint TD Account in February and March 2016 that is unaccounted for; and

(3) the transfer of the Poconos Properties in May and September 2016 that produced net proceeds in excess of $71,000.00.[12]

---

[12]    In his brief, the UST does not clarify whether he is referring to the transfer of the real estate itself or the transfer of the joint net proceeds from the Debtor and Mrs. Clark (as tenants by the entireties) to Mrs. Clark solely.  I assume the UST is referring to the latter.

The UST argues that these transfers implicate certain "badges of fraud" described earlier. The transfers moved assets to Mrs. Clark, an individual with a "close relationship" with the Debtor.[13]  Some or all of the transfers occurred while PuroSystems was pressing its breach of contract claim against the Debtor in arbitration.  Notwithstanding the transfers, the Debtor retained the beneficial use of the money insofar as Mrs. Clark used some of the available funds to enable the Debtor to hire counsel.  The UST also suggests that the transfers served to provide the Debtor with an appearance of having little in the way of assets that could be used to pay his debts.

Based on these circumstances, the UST urges the court to infer that the transfers were made with the requisite intent to hinder, delay or defraud creditors, thus warranting the denial of the Debtor's discharge.

In response, the Debtor characterizes the movement of funds to Mrs. Clark as the repayment of her loan to M.D. Clark, asking the court to accept the fact that such a loan existed in the absence of any documentation.  But see Finding of Fact Nos. 16-17 & n.3, supra.

## B. §727(a)(4)(A)

In seeking the denial of the Debtor's discharge under §727(a)(4), the UST points to the following misstatements or omissions in the Debtor's schedules and SOFA:

---

[13]      In making this argument, the UST must be assuming that the Debtor – and not Mrs. Clark – was entitled to distributions from M.D. Clark and that the deposit into the joint account represented the second of two (2) transfers, the first being from M.D. Clark to the Debtor and the second from the Debtor to the Debtor and Mrs. Clark jointly.  Also, in arguing that Mrs. Clark benefitted from her close relationship to the Debtor, the UST may be taking into account the $40,000.00 transferred from the Joint TD Account to Mrs. Clark's sole account.

1. the omission of the Joint TD Account on Schedule B;

2. the omission of the Debtor's monthly veteran's benefits on Schedule I;

3. the understated disclosure of his income in 2015 and 2016 on the Debtor's SOFA;

4. the failure to disclose the transfer of the Poconos Properties on the Debtor's SOFA;

5. the failure to disclose the receipt of "tens of thousands of dollars" at the conclusion of the M.D. Clark bankruptcy case."[14]

The UST acknowledges that the Debtor amended Schedule A/B to disclose the Joint TD Account just prior to the §341 meeting and disclosed the transfer of the Pocono Properties at the §341 meeting, but contends that the belated disclosures were insufficient to cure the taint of the initial false oaths.  The UST asks the court to find that the disclosures were material given: the number of errors; the fact that the erroneous statements related directly to the Debtor's financial affairs; the Debtor's sophistication and access to counsel; and the Debtor's failure fully to correct all of the errors in subsequent filings.  Accordingly, the UST requests that I infer that the misstatements were either intentional or made with a reckless disregard for the truth, warranting the denial of the Debtor's discharge.

---

[14] Presumably, the UST is referring to $58,400.00 the Debtor received between March 29, 2016 and April 22, 2018.

# V. DISCUSSION

## A. Overview

### 1.

At the outset, when one takes a step back and looks at the big picture, it is understandable why the UST is troubled by this chapter 7 bankruptcy case.

The Debtor is a well educated professional and the former principal of a once profitable business that became unsustainable.  Approximately one (1) month before his business filed a "quick sale and dismiss" chapter 11 bankruptcy that lasted less than two (2) months, the Debtor drew $57,000.00 from the company.  During the course of his business's short-lived bankruptcy case, and within three (3) weeks following its dismissal, the Debtor drew another $57,000.00 from his business.  In roughly the same three (3) month time period starting with the filing of the business bankruptcy case, the Debtor withdrew approximately $60,000.00 from a bank account held jointly with his wife, which he cannot account for, and transferred $40,000.00 from that joint account to an account held by solely by his wife.

Further, six (6) weeks after the conclusion of the business bankruptcy case, the Debtor and his spouse sold a jointly owned piece of real estate, netting approximately $35,000.00 and placed the funds in the spouse's sole bank account.  Four and one-half (4 ½) months later, the Debtor and his spouse sold a second piece of real estate, netting approximately $36,000.00 and again placed the funds in the spouse's sole bank account.  Slightly more than three (3) months later the Debtor filed his personal bankruptcy case.

So, in the thirteen (13) months before his bankruptcy filing, the Debtor (or the Debtor and his spouse jointly) received approximately $185,000.00 and withdrew or transferred in

excess of $100,000.00 from a jointly owned bankruptcy account.

Given this level of activity, one would expect a robust set of disclosures in the Debtor's

bankruptcy schedules and SOFA.  Yet, the Debtor's disclosures omitted the existence of

financial accounts, substantially understated his income in the two (2) year period preceding his

bankruptcy filing and failed to disclose the existence of any of the transfers described above.

**2.**

The UST attacks the Debtor's discharge in two (2) ways.

First, the UST challenges the <u>bona fides</u> of certain transfers either into the Debtor's joint

bank account with his spouse or transfers from that account to his spouse's solely held account

as transfers made with the intent to hinder, delay and defraud creditors.

Second, the UST attacks the adequacy of the Debtor's conduct in the bankruptcy case,

asserting that the errors and omissions in the bankruptcy schedules and SOFA constitute "false

oaths."

I will decide this case based on the UST's second theory.[15]  I agree with the UST that the

---

[15]     While I do not decide this matter based on the propriety of the asset transfers, I point out
that there are a number of uncertainties regarding the merits of the UST's legal theory.

To the extent that the UST focuses on the transfers from the Clarks' joint bank account at
TD Bank to Mrs. Clark individually, it is necessary to consider the likely tenancy by the entireties status
of their joint account.  Under Pennsylvania law, no transfer of entireties property to a third party is
fraudulent as to creditors of just one spouse. <u>E.g.</u> <u>In re Polichuk</u>, 506 B.R. 405, 438 (Bankr. E.D. Pa.
2014) (citing <u>C.I.T. Corp. v. Flint</u>, 5 A.2d 126, 128–29 (Pa. 1939)).

In this case, the Debtor's bankruptcy schedules indicate that he and his wife had no joint,
unsecured creditors.  This suggests that none of the transfers from the joint account to Mrs. Clark were
fraudulent as a matter of Pennsylvania law.  But, 11 U.S.C. §727(a)(2)(A) speaks of transfers made with
the **intent** to hinder, delay or defraud creditors.  What if the Debtor made the transfer with the subjective

(continued...)

-21-

Debtor's initial bankruptcy schedules and SOFA were so inadequate that the Debtor has forfeited

his right to receive a chapter 7 discharge.

### B.  The Debtor's Discharge Will be Denied Under 11 U.S.C. §727(a)(4)(A)

After carefully weighing the evidence, I conclude that the Debtor should be denied a

discharge under 11 U.S.C. §727(a)(4)(A).

### 1.

Based on the omissions and errors described earlier, it is indisputable that the Debtor's

initial bankruptcy schedules and SOFA contained false statements of fact. See Singh, 433 B.R. at

154 (a debtor's failure to list all assets in bankruptcy schedules can constitute a false oath under

§727(a)(4)(A)); In re Albert, 2018 WL 1605170, at *7 (Bankr. C.D. Cal. Mar. 29, 2018) (failure

to disclosure transfers in SOFA can constitute a false oath under §727(a)(4)(A)).

---

[15](...continued)
intent of putting the joint assets beyond the reach of his creditors because he did not realize that the
entireties assets already were protected under Pennsylvania law?  Does that satisfy the requirements of 11
U.S.C. §727(a)(2)(A), resulting in the denial of a chapter 7 discharge?

Cases considering the equivalent issue under 11 U.S.C. §548(a) – i.e., whether a transfer
of exempt property by a debtor, who was unaware of the transferred property's exempt status under
applicable nonbankruptcy law, with the intent to hinder, delay or defraud creditors is subject to avoidance
by a bankruptcy trustee under §548(a) – are divided on the issue.  Compare In re Lumbar, 457 B.R. 748,
753–55 (B.A.P. 8th Cir. 2011); In re Vorhes, 2018 WL 1577980, at *4 (Bankr. N.D. Iowa  Mar. 29,
2018); In re Smoot, 265 B.R. 128, 136–37 (Bankr.E.D.Va.1999), aff'd 257 F.3d 401 (4th Cir. 2001); In re
Wickstrom, 113 B.R. 339 (Bankr. W.D. Mich. 1990) with In re Trujillo, 215 B.R. 200, 205 (B.A.P. 9th
Cir. 1997), aff'd, 166 F.3d 1218 (9th Cir. 1998); In re Treiber, 92 B.R. 930 (Bankr. N.D. Okl. 1988).  The
policies underlying §548 transfer avoidance and §727 denial of discharge are not identical, so neither line
of cases is necessarily logically controlling here.

Because I am deciding this adversary proceeding on other grounds, I express no opinion
on the §727(a)(2)(A) issue.

Further, considering only the magnitude of the value of the undisclosed assets and transfers – $200,000.00 or more – I find the omission of the existence of the Joint TD Account on schedule A/B, the understated disclosure of the Debtor's 2015 and 2016 income, the failure to disclose the Joint TD Account Transfer and the failure to disclose the two (2) real estate transfers to be material.

This leaves only one (1) final issue to be determined: the Debtor's scienter.  Were the false statements in the schedules and SOFA "knowing and fraudulent," i.e., made with the intent to deceive or with reckless disregard for the truth of the statements, thereby satisfying the remaining elements under §727(a)(4)(A)?

**2.**

Some courts analyzing §727(a)(4)(A) have employed an evidentiary burden shifting approach.  "Where persuasive evidence of a false statement under oath has been produced by a plaintiff, the burden shifts to the defendant to prove that it was not intentionally [made] . . .  and fraudulent intent may be inferred, if the false statement is not explained."  In re Maletta, 159 B.R. 108, 112 (Bankr. D. Conn. 1993); accord Oakley, 503 B.R. at 426.

I find the burden shifting construct useful and will employ it here.

The quantity and magnitude of the errors and omissions in the Debtor's initial schedules and SOFA were such that the only reasonable inference to be drawn, absent some convincing explanation from the Debtor, is that the nondisclosures were either intentionally or recklessly made.  In other words, the UST's evidence makes out a prima facie case for denial of discharge under §727(a)(4)(A), leaving the Debtor with the burden of producing evidence explaining why

the glaring defects in his initial bankruptcy disclosures were not made intentionally or recklessly.

That said, the ultimate burden of proof remained with the UST.

**3.**

The Debtor asserts that the incorrect disclosure of his income in the two (2) years

preceding his bankruptcy filing in Paragraph 4 of his SOFA was a mere oversight in the drafting

of the schedules. He claims that when he disclosed his annual income for 2016 as $6,933.00, he

carried over his monthly income amount from line 4 of Schedule I, instead of using an annual

figure.

While this explanation has some degree of plausibility, ultimately, it is not convincing.

The assertion requires that I overlook the clarity of the question posed by Paragraph 4 of the

SOFA:

> Did you have any income from employment of operating a business **during this
> year or the two previous calendar years**?

(emphasis added).

The Debtor's explanation also does not account for his SOFA disclosure of 2015 income

as $9,750.00.  Nor could the Debtor explain at trial the basis for that disclosure.  Indeed, the

Debtor's 2015 federal income tax return discloses wages of $189,615.00, an amount that in no

way correlates to the SOFA disclosure of his 2015 income.

This second disclosure error regarding the Debtor's pre-petition income in 2015 is even

more troubling than the erroneous 2016 income disclosure and leads to the conclusion that the

Debtor exhibited a carelessness and disregard for the accuracy of his SOFA that rises to the level

of recklessness.[16]

**4.**

The other major errors in the Debtor's disclosures concern the nondisclosure of the existence of the Joint TD Account in the initial Schedule B, the nondisclosure of the Joint TD Account Transfer and the nondisclosure of the transfer of Pocono Properties. These subjects can be analyzed together.[17]

The Debtor asserts that he lacked a fraudulent intent because these errors were the product of confusion or misunderstanding. He also emphasizes that he complied with every request for information made by the chapter 7 trustee.

I am unconvinced by the Debtor's assertion that these nondisclosures are the product of some generalized confusion.

With respect to the nondisclosure in his initial schedule A/B of the Joint TD Bank Account, (an account through which hundreds of thousands of dollars passed in the roughly nine (9) month period before the Debtor filed his personal bankruptcy case), the Debtor's assertion that he did not understand that he had a duty to disclose is simply not credible in light of his experience, sophistication and education. The Debtor claims that he thought it unnecessary to

---

[16]     In fairness to the Debtor, I do credit his explanation that he did not include his monthly VA benefits in the calculation of his disclosed annual income because he believed that the benefits were entirely exempt and need not be disclosed. While his belief was incorrect, I do not find the assertion to be the product of either a fraudulent or reckless intent.

[17]     Arguably, the deposit of the proceeds of each real estate transaction in Mrs. Clark's solely held bank account constitute two (2) more undisclosed transfers (of property held as tenants by the entireties to Mrs. Clark).

disclose these transfers because they were joint properties held in tenancy by the entireties and thus, exempt from distribution.  This is no excuse – the Debtor must schedule the joint assets, even if they are exempt as entireties property.  At a minimum, the nondisclosure was the result of a reckless disregard of the Debtor's disclosure duty. In fact, in his initial schedules he disclosed the family home, which was held by the entireties but fully encumbered by a mortgage.  On his initial SOFA, the Debtor disclosed the recent closure of a joint bank account at Bank of America and a jointly-held safe deposit box at First Trust.  (Ex. D-1).  This undercuts his assertions that he did not believe joint property needed to be disclosed because it was exempt from creditor action: the Debtor's disclosures include joint property of no value but omit joint property which might, in the Debtor's understanding, have had value which the chapter 7 trustee could access.

The Debtor points out that, at least with respect to the nondisclosure of the Joint TD Account in schedule A/B, he amended the schedule to make that disclosure before the §341 meeting, a further indication, in his view, of his good intention.  This is true and there is some force to the Debtor's argument.  If the belated but unprompted disclosure of the bank account were the sole problem, I would be inclined to accept the Debtor's argument.  However, the unprompted correction of only one (1) omission in the face of several material nondisclosures carries only so much weight.

The Debtor's cooperation with the chapter 7 trustee after the nondisclosures came to light also does not negate what, at a minimum, was the Debtor's reckless disregard in failing to disclose initially the Joint TD Account Transfer and the Pocono Property transfers.  See generally Oakley, 503 B.R. at 424 (subsequent amendments to schedules "may rectify an honest mistake, but cannot expunge any fraud in the falsity of an oath on the original schedules").

-26-

I also note that the Debtor did not disclose the Joint TD Account Transfer on the

amended SOFA even after revealing the Pocono Property transfers and amending his SOFA

accordingly. This nondisclosure necessitated the UST to wade through bank records to ascertain

the transfer's existence. This nondisclosure alone arguably justifies the denial of the Debtor's

discharge.  Indeed, the very purpose of §727(a)(4)(A) is "to ensure that the debtor puts

dependable information in the hands of those interested in the administration of the bankruptcy

estate without the need for the trustee or a party in interest to engage in costly, exhaustive

investigations to ferret out the truth concerning the Debtor's financial condition."  In re Giquinto,

388 B.R. 152, 178 (Bankr. E.D. Pa. 2008). This nondisclosure alone arguably justifies the denial

of the Debtor's discharge.  See,e.g., In re Manfredonia, 561 B.R. 1 (Bankr. D. Mass. 2016)

(discharge denied under §727(a)(4)(A) for failing to disclose transfers from joint account to

individual account of non-debtor spouse); In re Shanahan, 2013 WL 3216131, at *5 (Bankr. D.

Mass. 2013) (discharge denied for failing to disclose pre-petition transfers of joint property to

non-debtor spouse).

**5.**

The Debtor's most potentially compelling defense is his assertion that his health

problems so impaired his memory that his mistakes were not the result of either a fraudulent

intent or a reckless disregard of his disclosure duty.  However, this contention was not supported

by sufficient evidence.

The Debtor provided little or no context regarding the history and details of his medical

problems and how these problems may have adversely impacted his cognitive functioning,

particularly in the year preceding his bankruptcy filing.[18]  There is no evidence beyond the

Debtor's self-serving testimony and a letter from his doctor stating that the Tylenol he uses for

pain causes cognitive dysfunction.  The conclusory statement in the doctor's letter that suggests

that Tylenol caused the Debtor's memory loss is counterintuitive and unpersuasive.  Without a

more detailed, scientific explanation of the causal link between the use of Tylenol and memory

dysfunction, I will not credit this evidence.

While I do credit the Debtor's testimony regarding his subjective belief that his mental

faculties have deteriorated – he testified that he must write things down more and often misses

appointments –  this account of cognitive deterioration, by itself, is unpersuasive as a cause for

the unacceptable quality of the Debtor's bankruptcy disclosures.  The glaring errors in the

schedules and SOFA are made more troubling by the fact that this was the second bankruptcy

case in which the Debtor actively participated in only a one (1) year span.  In his testimony, the

Debtor did not suggest that he had similar cognitive problems when he provided the same

disclosures as principal of the M.D. Clark in its bankruptcy case.

I also agree with the UST who points out that the Debtor had ample time between the

date he retained counsel in November 2016 and the date he filed his schedules and SOFA in

January 2017 to obtain assistance from his attorney or otherwise to insure the accuracy of the

required disclosures.  Frankly, the memory/cognitive problems the Debtor relies on to excuse his

actions simply seem too convenient.

---

[18]      I know from the Debtor's testimony that he retired from the military over thirty (30) years
ago for health reasons. I also know that his medical issue did not hold him back from achieving both
academic and professional success over the years and that he continues to work as a professional in his
field.

I have previously observed that a debtor's subjective state of mind "is ultimately unknowable with certainty." In re Ritter, 404 B.R. 811, 827 (Bankr. E.D. Pa. 2009). When a ruling turns on a debtor's scienter, the judge "usually must assess the Debtor's credibility against the weight of the evidence offered against him, relying largely on [the judge's life] experience and human intuition." In re Ricker, 475 B.R. 445, 458 (Bankr. E.D. Pa. 2012).

One aspect of the Debtor's defense, and his testimony in particular, stands out and contributes to my rejection of his assertion that all of the disclosure errors were innocent, despite his care in completing his bankruptcy schedules and SOFA. I refer to the Debtor's contention that while M.D. Clark was operating prior to its bankruptcy filing, he and his wife jointly drew down on their personal, home equity loan, divided the loan proceeds and then made separate loans to M.D. Clark of $60,000.00 each. He used these "loans" to try to justify the successive transfers from M.D. Clark to the Joint TD Account and then to Mrs. Clark's Individual TD Account. I find this narrative farfetched. There is nothing in the M.D. Clark financial documents in evidence that supports the Debtor's testimony on this point. By offering this implausible explanation, the Debtor seriously undercut his credibility in this proceeding.

Without more objective evidence supporting the Debtor's main defense, I cannot accept it. In sum, the Debtor failed to meet his burden of introducing evidence to provide a satisfactory, innocent explanation for the serious defects in his bankruptcy disclosures.

# VI.  CONCLUSION

The factual record here is somewhat incomplete, which is not an uncommon occurrence in nondischargeability litigation (and litigation in general).  When I connect the dots, the picture that forms is of a business owner who had accumulated some measure of personal wealth, but who, after closing his business, faced substantial personal liability (in particular, based on the PuroSystems arbitration).  To protect himself, he moved as many assets as he could into his wife's name.  While some or all of those spousal transfers involved jointly owned assets that apparently were not subject to the claims of his creditors, the Debtor likely was unaware of the protections afforded entireties property under Pennsylvania law.  Once those transfers were completed, the Debtor sought bankruptcy relief.  By that time, it appears that he convinced himself that the various transfers were sufficiently remote or unrelated to the bankruptcy case that they need not be disclosed; he could present himself to the court and his creditors as though he held virtually no assets.

The Debtor's initial bankruptcy schedules and SOFA were unacceptable.  Several material disclosures - primarily regarding a joint bank account that had substantial activity and various transfers that occurred in the year prior to his bankruptcy filing - were either incorrect or omitted entirely.  For purposes of deciding this adversary proceeding, it is enough to say that even if the material errors and omissions were not the product of the Debtor's specific fraudulent intent, the Debtor exhibited a reckless disregard of his duty to make, at a minimum, a full financial disclosure in his bankruptcy case.  As a result, the Debtor's bankruptcy discharge must be denied under 11 U.S.C. §727(a)(4)(A).

An appropriate order will be entered.

**Date:   October 10, 2018**

_____
**ERIC L. FRANK**
**U.S. BANKRUPTCY JUDGE**

### Appendix I.  Table Summary of the Transactions Described Above

| Date/Time Period | Transfers: M.D. Clark to Joint Account | Withdrawals from Joint TD Account | Transfers: Joint TD Account to Mrs. Clark | Transfer of Joint Sale Proceeds to Mrs. Clark |
|---|---|---|---|---|
| **Prior to 2/5/2016** **M.D. Clark bankruptcy filing** | $57,000.00 January 2016 | | | |
| | | | | |
| **During Pendency of M.D. Clark bankruptcy filing: 2/5/2016 to 3/31/2016** | $10,000.00 3/29/16 $47,000.00 3/31/16 | $22,000.00 2/27/16 $18,339.00 2/27/16 $1,200.00 3/20/16 $10,000.00 3/29/16 $9,200.00 4/2/16 to 4/6/16 | $40,000.00 4/4/16 | |
| | | | | |
| **After 3/31/2016** **dismissal of M.D. Clark bankruptcy** | $1,400.00 4/22/18 | | | $35,937.73 5/13/16 $36,598.76 9/30/16 |